Richard BORDER, Plaintiff–Appellant,

v.

CITY OF CRYSTAL LAKE, an Illinois municipal corporation, Defendant–Appellee.

No. 95–1900.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1995.

Decided Jan. 23, 1996.

Matthew J. Piers, Jonathan A. Rothstein (argued), Jennifer L. Fischer, Michael J. Flaherty, Gessler, Flynn, Fleischmann, Hughes & Socol, Chicago, IL, for Plaintiff–Appellant.

Michael Coppedge (argued), Cowlin, Curran & Coppedge, Crystal Lake, IL, for Defendant–Appellee.

Before FLAUM, EASTERBROOK, and WOOD, Jr., Circuit Judges.

FLAUM, Circuit Judge.

Richard Border sued the City of Crystal Lake, Illinois alleging a denial of due process in his employment termination and also retaliatory discharge under Illinois tort law. The district court granted summary judgment for the City on the due process claim, finding that Border had failed to establish a property right in his job, and dismissed the pendent state law claim. We affirm.[1]

## I.

The following are the relevant facts, taken in the light most favorable to the non-moving party, i.e., Border, and with all reasonable inferences drawn in his favor. *Lawshe v. Simpson,* 16 F.3d 1475, 1478 (7th Cir.1994). Richard Border began working for the City of Crystal Lake ("Crystal Lake") in August 1986 in the street department. In 1987 Border was given a copy of the Crystal Lake Personnel Policies Handbook ("Handbook"). Border asserts that the Handbook was adopted annually by the Crystal Lake City Council.[2] The contents of the Handbook are at the heart of Border's case, so it is necessary to review the relevant sections in some detail.

The preface to the Handbook's numbered provisions notes that its "policies may be amended or revised to meet changing conditions." The Handbook establishes a program of yearly performance reviews and also a format for employee grievances and concerns. The grievance provision states that the outlined procedures "shall be utilized whenever an employee desires to raise a question concerning his or her employment, the operational procedures affecting the employee, or the review of his or her termination." The Handbook provision laying out Crystal Lake's sick-leave policy notes that "[e]xcessive use or abuse of sick leave is a valid criterion in employee evaluation and may be grounds for disciplinary action or termination." Similarly, the section on medical disability leave states that "[f]ailure to return to work after being released by a physician to do so is cause for dismissal." This section also establishes that Crystal Lake can require medical information verifying an employee's disability or continuing disability at any time. Additionally, the Handbook provides that an employee could be subject to "disciplinary action" for noncompliance with the elaborated rules on secondary employment and for using an official position to coerce or influence others politically.

The language most pertinent to the issues in this case, however, appears in the second-to-last section of the Handbook, under the heading "General." The relevant paragraph reads as follows:

argument and did not address the others. Since we affirm this grant, we address neither the facts nor the legal arguments that formed the basis of the other two claims.

1. The City of Crystal Lake based its summary judgment motion on three separate arguments: 1) Border had no protected property interest in employment; 2) Border failed to invoke the City's mandatory grievance procedures, thus disabling him from making a procedural due process claim; and 3) Border's termination can be justified by the after-acquired evidence that he lied on his employment application. The district court granted summary judgment on the first

2. While the Handbook was revised during the period of Border's employment, the changes are immaterial to this case.

During the entire duration of employment with the City, all employees are responsible for adherence to all codes, rules, policies, and regulations of the City, and for conduct and performance in an acceptable manner. All employees are subject to, and department heads and supervisors are responsible for, verbal or written reprimand, suspension, or dismissal from employment with the City at any time, as may be appropriate, for conduct or performance. Nothing in these Personnel Policies is intended to imply that these policies serve as an employment contract.

In addition to the written Handbook conditions of employment, Border maintains that shortly after he started working, he was told by his supervisor that he could be fired for not showing up to plow snow. In the time that Border worked for Crystal Lake, he never heard of anyone who was fired without a good reason being given. Moreover, Jacqueline Petersen, Crystal Lake's personnel director, stated in her 1994 deposition that she had reviewed a list of the employees terminated in the preceding twelve years, and in each case a reason was stated for the termination.

Late in 1990, Border injured his back. On December 17, 1990, he completed a written report of his injury. Jacqueline Petersen initially questioned the nature and extent of his injury. Border continued to have back pain throughout that winter and eventually saw doctors who confirmed that he did have a lower back injury. On February 27, 1991, he filled out a worker's compensation claim. By March 1991, Border found himself unable to continue working.

In April 1991, Border returned to work under his doctor's limitation that he perform light duty work only. He was sent home, however, when it was determined that there was no such work available. On July 2 of that year, Petersen sent Border a letter stating that by July 10 Crystal Lake needed documentation from Border's physician regarding his present physical condition, treatment plan, and prognosis. On July 12, Border's attorney wrote Petersen, stating that they had "previously tendered ... sufficient documentation," but that additional copies of this (old) information were enclosed. On July 18, Petersen again wrote Border, stating that the information requested in the July 2 letter had not been received and should be submitted immediately. On July 23, Border hand delivered a letter to Petersen, acknowledging her July 18 letter and directing her to his attorney for all future correspondence. The letter further stated that Border had contacted his attorney and directed him to send the updated information as soon as possible. (Border offers no evidence that such information was actually sent.) The letter provided the name, address, and phone number of this attorney. Finally, on August 5, 1991, Border hand delivered another letter to Petersen, this time stating that he had retained new counsel and listing the new attorney's name, address, and phone number. (Crystal Lake denies receiving either of these hand-delivered letters.) These were the only contacts between Border and Crystal Lake during the remainder of 1991.

On January 2, 1992, Petersen wrote a letter to Border, informing him that he should consider his employment terminated as of December 31, 1991. She noted that he had never provided the medical documentation requested in her two July 1991 letters. She also stated that each month since July, Border had personally brought in a check paying the premium for his health and dental benefits, yet never tried to talk to her or her supervisor about his physical condition. She stated that he had, in essence, abandoned his job with the City of Crystal Lake.

## II.

 We review the district court's grant of summary judgment de novo, evaluating the evidence in the light most favorable to the non-moving party. *Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir.1995). We will affirm the entry of summary judgment only if there is no genuine issue as to any material fact, such that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In order to make his due process claim, Border must first establish that he had a property interest in his job of the sort that the Constitution protects. The Supreme Court has been clear that such property interests "are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A person's interest in a benefit, such as continued employment, constitutes "property" for due process purposes only if "there are such rules or mutually explicit understandings that support his claim of *entitlement* to the benefit." *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972) (emphasis added). The Supreme Court has further directed us to examine state law to determine whether a person's interest in continued employment qualifies as a legally-protected property interest. *Id.* at 602 n. 7, 92 S.Ct. at 2700 n. 7; *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) ("[T]he sufficiency of [a] claim of entitlement must be decided by reference to state law."); *see also Miller v. Crystal Lake Park Dist.,* 47 F.3d 865, 867 (7th Cir.1995) ("[O]ur cases have equated 'property' with the set of claims that state law recognizes.").

A protected property interest in employment can arise from a statute, regulation, municipal ordinance, or an express or implied contract—those "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Domiano v. Village of River Grove,* 904 F.2d 1142, 1147 (7th Cir.1990) (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709); *Hohmeier v. Leyden Community High Schools District 212,* 954 F.2d 461, 464 (7th Cir.1992) (state agency regulation and municipal ordinance).[3] In some contexts, promises made in an employee handbook can give rise to a legitimate claim of entitlement sufficient to be protected as a property inter-

est. *Campbell v. City of Champaign,* 940 F.2d 1111, 1112 (7th Cir.1991).

Since Border was employed in Illinois, we look to Illinois law to determine whether he had a property interest in his job. The Illinois Supreme Court has established that "an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present." *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.,* 115 Ill.2d 482, 106 Ill.Dec. 8, 12, 505 N.E.2d 314, 318 (1987). The requirements for such a contractual obligation are as follows:

> First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement.

*Id.* A person who can demonstrate fulfillment of these three conditions will have a contractual property interest in employment. Illinois courts have recognized, however, that a disclaimer within an employee handbook can be sufficient to show that no "clear promise" of continuing employment was made, and thus that the handbook did not create a legitimate claim of entitlement to employment. *See, e.g., Moore v. Illinois Bell Tel. Co.,* 155 Ill.App.3d 781, 108 Ill.Dec. 358, 360, 508 N.E.2d 519, 521 (1987) (finding employee promised "nothing" where employee plan stated it was "a statement of management's intent and ... not a contract or assurance of compensation"); *cf. Duldulao,* 106 Ill.Dec. at 13, 505 N.E.2d at 319 (finding clear promise after noting that handbook contained no disclaimers).

Border argues that he had a property interest in continued employment based on the combination of three factors: 1) promises

---

**3.** The Supreme Court noted in *Perry v. Sindermann* that the unwritten "common law" of a particular organization may also be sufficient to create a property interest in employment. 408 U.S. at 602, 92 S.Ct. at 2700. Since Border makes no "common law" property interest claim, however, we do not address the boundaries of this approach.

contained within the employee handbook; 2) Crystal Lake's practice of terminating only for cause; and 3) oral statements by Crystal Lake representatives. He maintains that the "fatal flaw" in the district court's analysis was to treat these elements disjunctively, rather than collectively. We recognize that "[e]xplicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances.'" *Cushing v. City of Chicago,* 3 F.3d 1156, 1160 (7th Cir.1993) (quoting *Perry,* 408 U.S. at 602, 92 S.Ct. at 2700). Thus we will address each of the three factors in turn and then evaluate their combined significance.

 Border argues that the Crystal Lake Handbook is enforceable either as an ordinance or as an implied contract. Crystal Lake maintains that the ordinance argument was not made to the district court, and hence has been waived. Border denies that the argument was waived, directing us to his Memorandum of Law in Response to [Crystal Lake's] Motion for Summary Judgment. Yet the memo contains no *argument* about the significance of the Handbook as an ordinance, rather it merely states, in a footnote, that the Handbook was adopted each year by city ordinance. Consequently, it is unsurprising that the district court did not address the significance of the Handbook as an ordinance, and we find that the argument has been waived.[4] *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir.1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments ... are waived (even where those arguments raise constitutional issues).").

If the Handbook is to be enforced as an implied contract, the first prong of the *Duldulao* test must be met: the language must contain a sufficiently clear promise. The language of the Handbook, however, contains no promise of continuing employment and no assurance that employees will be dismissed only for "just cause." Border would have us find such a promise implicit in the Handbook language that employees are subject to reprimand, suspension, and dismissal "at any

time, as may be appropriate, for conduct or performance." Yet interpreting the "conduct or performance" language as establishing just cause termination protection simply ignores the reality of employment law in Illinois and the need to read the Handbook as a coherent whole. The presumption in Illinois is that employment is at will, *Duldulao,* 106 Ill.Dec. at 11–12, 505 N.E.2d at 317–18, and Border has pointed us to no Illinois case where such weak language is found sufficient to rebut the at-will presumption. More importantly, any incipient hope of a contractual promise raised by the "conduct or performance" language is utterly dashed by the sentence that immediately follows it: "Nothing in these Personnel Policies is intended to imply that these policies serve as an employment contract." This language is clear; no employee reading this "General" section of the Handbook could reasonably believe that an employment contract offer had been made.

Border correctly notes that Illinois courts do not always enforce such disclaimer provisions. *See Perman v. ArcVentures, Inc.,* 196 Ill.App.3d 758, 143 Ill.Dec. 910, 554 N.E.2d 982 (1990); *Hicks v. Methodist Medical Ctr.,* 229 Ill.App.3d 610, 170 Ill.Dec. 577, 593 N.E.2d 119 (1992); *Long v. Tazewell/Pekin Consol. Communication Ctr.,* 215 Ill.App.3d 134, 158 Ill.Dec. 798, 574 N.E.2d 1191 (1991). Yet none of the decisions to which he directs our attention provide a reason to ignore the Handbook's clear disclaimer language.

In *Perman v. ArcVentures,* the Illinois Appellate Court addressed an employment manual that contained both a disclaimer (stating that the manual did not limit the employer's termination rights or constitute an employment contract) and a number of provisions that seemed to ensure that employees would not be terminated except for cause. The manual contained a long list of specific activities that could result in dismissal and noted that "discharges must be approved in advance by the director of employee relations, or designee, and are subject to employee appeal through established grievance proce-

---

4. Ultimately, this waiver costs Border nothing, since even as an ordinance, the language of the

Handbook does not establish a legitimate claim of entitlement to continuing employment.

dures." 143 Ill.Dec. at 913, 554 N.E.2d at 985. The manual also stated that it was the employer's policy "to assure" every employee the right to appeal an unfavorable employment decision. *Id.* The court concluded that this "unequivocal language" negated the effect of the disclaimer provision and established that Perman was not an at-will employee. *Id.* at 915, 554 N.E.2d at 987. While we have doubts that the *Perman* decision represents the majority view in Illinois, the language of the Crystal Lake Handbook does not meet even the rather permissive standard of *Perman.* The Handbook put no limits on how discharges could be carried out and provided Crystal Lake employees with no reason to disregard its clear disclaimer that no employment contract existed.

In *Hicks v. Methodist Medical Center,* the Illinois Appellate Court found that a disclaimer that was not highlighted, printed in capital letters, or entitled "Disclaimer" was not sufficiently conspicuous to negate the promises contained in the employee handbook at issue. 170 Ill.Dec. at 579–80, 593 N.E.2d at 121–22. The inconspicuous disclaimer argument is no help to Border, however, since the language he focusses on ("for conduct or performance") immediately precedes the language of disclaimer. An employee could not finish the paragraph without knowing he or she had no employment contract.

Finally, the Illinois Appellate Court's decision in *Long v. Tazewell/Pekin Consol. Communication Ctr.* likewise provides no solace for Border. The manual at issue in that case contained substantial "unequivocal mandatory" language regarding employee "rights and duties," required notice and investigation before any termination, and established a progressive disciplinary system. 158 Ill.Dec. at 799–800, 574 N.E.2d at 1192–93. The *Long* court also found that the disclaimer provision was "in effect hidden" within a section describing job duties. *Id.* at 800–01, 574

N.E.2d at 1193–94. The decision to ignore the disclaimer in such a manual gives us no reason to ignore the disclaimer in Crystal Lake's employee handbook.

■ Border attempts to shore up his clear promise argument by noting that the Handbook does contain a grievance procedure mechanism and a number of provisions establishing that certain actions could result in termination or disciplinary action. Illinois courts have recognized that the *lack* of termination and grievance procedures weighs strongly against a finding of for cause employment. *Ahlgren v. Blue Goose Supermarket, Inc.,* 266 Ill.App.3d 154, 203 Ill.Dec. 363, 368, 639 N.E.2d 922, 927 (1994). But this does not mean that the *presence* of such procedures indicates for cause employment, especially in the face of clear "no employment contract" language. In addition, the Handbook did not contain any termination procedures, only grievance procedures. Border claims a property deprivation in the loss of his job, not in the failure to provide grievance procedures.[5] Thus he must show entitlement to the job, not just to the procedures. *Campbell v. City of Champaign,* 940 F.2d 1111, 1113 (7th Cir.1991); *Farmer v. Lane,* 864 F.2d 473, 478 (7th Cir.1988).

Similarly, the fact that Crystal Lake has decided to give specific warning that certain behaviors (i.e., abuse of sick leave, failure to return to work after physician release, noncompliance with secondary employment rules, and political misuse of an official position) will be punished, perhaps even result in termination, is no limitation on its power to punish for other reasons (or indeed to terminate for no reason at all, since the employment is at will). *Campbell,* 940 F.2d at 1112; *Lashbrook v. Oerkfitz,* 65 F.3d 1339, 1347 (7th Cir.1995) (finding policy manual language that employee could be dismissed "for just cause" did not mean employee could be dismissed *only* for just cause).[6] Even Bor-

---

5. Crystal Lake maintains that Border failed even to invoke the grievance mechanism—a charge that Border does not appear to deny.

6. Border maintains that he has a property interest under *Lewis v. Hayes,* 152 Ill.App.3d 1020, 106 Ill.Dec. 102, 105, 505 N.E.2d 408, 411 (1987). The *Lewis* court found for cause employ-

ment in village rules stating that a probationary employee could be terminated "if he is found incompetent or disqualified for the performance of his duties." In addition, the village rules required that terminations take place "by and with consent of the Commission after the chief submits written reasons for the termination."

der does not claim that the four listed reasons constitute an exhaustive list of the reasons for which Crystal Lake could terminate an employee. And without any contractual language or implied promise limiting the employer's power to fire, these provisions cannot reasonably be read even to function as "examples" of a more general just cause concept within the Handbook. They are gratuitous warnings and nothing else.

After the Handbook, Border next directs us to Crystal Lake's "practice" of terminating only for cause.[7] He recalls that other employees were fired for things like abusing sick leave, stealing property, being frequently tardy, and performing inadequately. Border also directs us to Petersen's 1994 deposition testimony, in which she stated that Crystal Lake's list of employees terminated within the preceding twelve-year period contained a stated "reason" for each termination.[8] But Crystal Lake's choice to treat its employees fairly and to retain them unless there was a "reason" not to, does not undermine its power to terminate them at will—at least not in the face of such clear Handbook language that its policies should not be understood to constitute an "employment contract."

Finally, Border claims that oral statements made by Crystal Lake representatives supported his reasonable belief that he could only be fired for cause. Yet the only such statement that Border actually reports is that one of his supervisors told him that employees could be fired for failing to show up for snowplowing duties. It is ridiculous to call such a statement—simply an additional gratuitous warning—a "promise" of anything.

Adding up the Handbook, Crystal Lake's termination practices, and the snowplowing warning does not bring Border any closer to getting over the "clear promise" hurdle.

They are inadequate individually, and they remain inadequate collectively. Unlike the plaintiff in *Vajda v. Arthur Andersen & Co.*, 253 Ill.App.3d 345, 191 Ill.Dec. 965, 970, 624 N.E.2d 1343, 1348 (Ill.Ct.App.1993), who also pointed to the collective effect of written and oral statements, Border simply has not shown sufficient evidence from which a trier of fact could reasonably infer that he was promised continuing employment absent good cause for dismissal.

Since Border has created no genuine issue of material fact as to whether he had a property interest in employment, he has no basis to claim a violation of due process. Thus we AFFIRM the district court's grant of summary judgment for Crystal Lake, as well as its dismissal of the pendent state law tort claim.

---

The case is not analogous, however, since the Handbook imposed no termination procedures and did not require that a "reason" be given. More significantly, the village rules in *Lewis* contained no disclaimer.

7. While we do not reach this issue, since we find that Border had no protected property interest in his employment, the facts provided by Border lead us to believe that his firing would have been consistent with any such practice anyway.

8. Such testimony alone provides frail support for Border's just cause argument, since apparently no attempt was made to clarify the nature of the "reasons" given. Such testimony supports the proposition that the employer did not terminate people "for no reason at all," but does not rebut the possibility that the employer terminated people for "bad reasons" (e.g., refusal to engage in illegal activity) rather than "good reasons," i.e., just cause.